UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | : | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CASE NO. 1:21-cr-00815 |
| | : | |
| Plaintiff, | : | OPINION & ORDER |
| | : | [Resolving Doc. 39] |
| v. | : | |
| | : | |
| JIMAAH KPAKPO, | : | |
| | : | |
| Defendant. | : | |
| | : | |

JAMES S. GWIN, UNITED STATES DISTRICT COURT JUDGE:

In this case involving the controlled delivery of sham narcotics, Defendant Jimaah Kpakpo challenges his detention, interview, and arrest. Because none of these events violated the Fourth or Fifth Amendments or Kpakpo's *Miranda* rights, the Court **DENIES** Defendant's motion to suppress.

I. Background

A. Law enforcement intercepts the loaded vehicle.

On October 18, 2021, law enforcement received information that a car loaded with narcotics was travelling by car hauler from California to Cleveland, Ohio.[1] Indiana police officers stopped the car hauler east of Indianapolis.[2]

Officers became suspicious of a Honda Accord on the hauler. "The value of the car did not make sense to ship for $1,000 transport fee, the shipper and receiver were

---

[1] Gov't Ex. 2 ¶ 6.
[2] *Id.* at ¶ 7.

Case No. 1:21-cr-00815
GWIN, J.

concealed on the paperwork, the same phone number was listed on both ends, and [the car-hauler driver] said it was just left outside an auction facility for him to pick up."[3]

A drug-detection canine alerted law enforcement that the Accord probably contained narcotics.[4] Law enforcement searched the Accord and discovered nearly 50 pounds of methamphetamine and heroin hidden in its door panels.[5] They seized the drugs.[6]

On October 19, 2021, law enforcement obtained and executed a search warrant to place a GPS tracker in the Accord.[7] Law enforcement also replaced the drugs with "sham" narcotics.[8]

Law enforcement monitored the car hauler as it delivered the loaded Accord to a recipient in Cleveland.[9] Efrain Zelaya Urbina took the Accord possession at a Brookpark Road parking lot after providing identification to the car hauler. Urbina then drove the car to Akron, making several stops along the way.[10] Urbina used driving techniques designed to detect law-enforcement surveillance.[11]

Urbina then left the Accord in an Akron motel parking lot. Urbina then solicited a car service to take him from the Akron motel to the Cleveland airport area. Urbina left the Accord in the Akron motel parking lot.

---

[3] Gov't Ex. 5 at 3.
[4] *Id.*
[5] *Id.*
[6] Gov't Ex. 4 at 2.
[7] Gov't Ex. 7.
[8] Gov't Ex. 2 at ¶ 10.
[9] *Id.* at ¶ 11.
[10] *Id.* at ¶ 19–20.
[11] *Id.* at ¶ 19.

Case No. 1:21-cr-00815
GWIN, J.

That evening, Kpakpo and his brother arrived at the motel.[12]  Kpakpo used a key to access the Accord.  Kpakpo then drove off in the Accord while Kpakpo's brother followed in Kpakpo's SUV.[13]  Kpakpo began a long drive towards Pennsylvania.

### B. Law enforcement stops Kpakpo.

Shortly after 10:00 PM on October 20, 2021, Ohio Highway Patrol stopped the Accord and the SUV.[14]  The Ohio Highway Patrol stopped Kpakpo after more than 60 travel miles and near the Pennsylvania border. Trooper Benjamin Miller placed Kpakpo in his cruiser and told Kpakpo that Kpakpo was detained.[15]

A few minutes later, Homeland Security Special Agent Kampman arrived and confiscated Kpakpo's cell phones.[16] Kampman spoke briefly with Kpakpo. Kpakpo admitted he had "been in trouble before." Agent Kampman told Kpakpo that "if you can put any money, drugs, or guns … in my hands tonight, that's the difference about whether you gotta go to jail tonight," and advised him to "think about that" on the way back to Cleveland.[17] Agent Kampman also asked who Kpakpo's companion was.[18] Kpakpo said it was his brother, who "[had] nothing to do with it."[19]

A few minutes after his exchange with Agent Kampman, at approximately 10:30 PM, Trooper Miller reiterated that Kpakpo was detained and recited his *Miranda* rights.[20]

---

[12] *Id.* at ¶ 24.
[13] *Id.*
[14] *Id.* at ¶ 25.
[15] Gov't Ex. 9 at 21:25–22:40.
[16] *Id.* at 24:00–26:10.
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *Id.* at 27:52–29:07.

Case No. 1:21-cr-00815
GWIN, J.

Several minutes later, law enforcement removed Kpakpo from the cruiser, handcuffed him, and placed him back in the cruiser for transport.[21] Agent Kampman's report says that while outside the cruiser, Kpakpo admitted to deleting evidence from his phone before Kampman confiscated the phones.[22]

Trooper Miller then drove Kpakpo to the Cleveland Homeland Security field office. On the way, Miller told Kpakpo that agents had found cocaine and heroin in the car.[23] Trooper Miller asked questions about Kpakpo's background and his brother.[24] But apart from those exchanges and a brief chat about sports, the Trooper and Kpakpo rode in silence.[25]

### C. Homeland Security Agents interview Kpakpo.

Agents Kampman and Wood interviewed Kpakpo shortly after midnight on October 21, 2021.

Agent Kampman explained that Kpakpo "could agree to jus' talk, stop talkin' any time you want, but we gotta at least start to have a conversation … ."[26] Kampman then read Kpakpo his *Miranda* rights again.[27] Kpakpo signed a written *Miranda* waiver.[28]

Kpakpo said he was motivated to speak to officers to find out what they knew.[29] Agent Kampman reiterated that regardless of Kpakpo's motivation for speaking, anything

---

[21] *Id.* at 42:50–48:40.
[22] Gov't Ex. 11 at 3.
[23] Gov't Ex. 11 at 3–4.
[24] *Id.* at 4–5.
[25] *See* Gov't Ex. 5.
[26] Gov't Ex. 15 at 2.
[27] *Id.* at 2–3.
[28] Gov't Ex. 13.
[29] Gov't Ex. 15 at 4.

- 4 -

Case No. 1:21-cr-00815
GWIN, J.

Kpakpo said could be used against him at trial.[30]  Kpakpo responded, "used against me … in the court of law and I understand that."[31]

Agent Wood chimed in that signing the *Miranda* waiver was not an admission. Wood then said, "You have the right to talk to us."  He immediately restated, "You have the right not to answer our questions."[32]

Kpakpo then spoke with the agents for about an hour.[33]  He made further incriminating statements and gave a description of the man who handed him the Accord's key.[34]

### D. The Court issued an arrest warrant.

Later on October 21, 2021, Magistrate Judge Baughman issued a criminal complaint and arrest warrant.[35]  The complaint charged Kpakpo with attempt and conspiracy to possess drugs with the intent to distribute them.[36]

## II. Discussion

Kpakpo primarily argues that the warrantless stop and arrest near the Pennsylvania border violated the Fourth Amendment.  He also argues that his custodial interrogation violated *Arizona v. Miranda*'s warning requirements and his Fifth Amendment right against involuntary confessions.

---

[30] *Id.*
[31] *Id.*
[32] *Id.* at 5.
[33] During the suppression hearing, both parties stated the interview was longer. But the interview video's run time is only 01:02:36.  Gov't Ex. 14.
[34] Gov't Ex. 15 at 35–36.
[35] Doc. 1; Doc. 2.
[36] Doc. 1.

Case No. 1:21-cr-00815
GWIN, J.

### A. Kpakpo's arrest was lawful.

Because law enforcement had probable cause to arrest whoever picked up the Accord, Kpakpo's warrantless arrest did not violate the Fourth Amendment.

"[A] warrantless arrest by a[n] officer is reasonable under the Fourth Amendment where the arrest is in public and there is probable cause to believe that a criminal offense has been or is being committed."[37]

To decide whether probable cause exists, courts "examine the events leading up to the arrest,"[38] to decide whether, "given the practical and factual considerations of everyday life, [those events] could lead a reasonable person to believe that an illegal act has occurred or is about to occur."[39]

In *United States v. Lyons*, this Court found probable cause for the arrest of someone who receives a known drug delivery and demonstrates familiarity with the delivery.[40]

Here, several factors would make a reasonable person suspect that anyone driving the Accord was involved in a drug-trafficking conspiracy:

- the suspicious nature of the car's shipment,
- the quantity and street value of drugs in the car,
- the attempt to evade detection by hiding the drugs inside the car's doors,
- Efrain Zelaya Urbina's frequent stops and use of countersurveillance techniques between Cleveland and Akron,
- Urbina's multiple checks to ensure all four of the Accord's doors were locked

---

[37] *United States v. Abdi*, 463 F.3d 547, 557 (6th Cir. 2006) (citing United States v. Watson, 423 U.S. 411, 417–24 (1976)).
[38] *Id.* (internal citations omitted).
[39] *United States v. Gill*, 685 F.3d 606 (6th Cir. 2012) (quoting *United States v. Strickland*, 144 F.3d 412, 416 (6th Cir. 1998)).
[40] *United States v. Lyons*, 1:21-cr-816, 2022 WL 152497, at *3 (N.D. Ohio, Jan. 18, 2022).

- 6 -

Case No. 1:21-cr-00815
GWIN, J.

- Urbina's leaving the Accord in the Akron motel parking lot and Urbina's securing a car service to take Urbina to a location near the Cleveland airport.

Further, Kpakpo arrived on the scene with the Accord's key, suggesting he had contact with the person who owned the car and his familiarity with the vehicle. Officers then tracked Kpakpo to the Ohio–Pennsylvania border, evidencing that Kpakpo likely intended to drive the loaded Accord across state lines.

### B. Kpakpo's custodial interrogation was lawful.

Because law enforcement complied with its *Miranda* obligations and did not coerce Kpakpo into making involuntary statements, the Court denies Kpakpo's motion to suppress statements to Agents Kampman and Wood.

#### i. Law enforcement complied with *Miranda*.

Kpakpo argues that *Miranda* required officers to tell him whether he was under arrest or free to go. This argument reverses the question. Questioning officers bear no burden to give *Miranda* warnings unless the officers have restricted the subject's freedom.

Law enforcement must give a *Miranda* warning before interrogating a suspect in custody.[41] But *Miranda*'s custody inquiry turns on "how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action."[42] This is a totality-of-the-circumstances standard.[43]

A reasonable person in Kpakpo's circumstances would have understood he was in custody. Trooper Miller told Kpakpo twice that he was detained and placed him in the

---

[41] *United States v. Luck*, 852 F.3d 615 (6th Cir. 2017)
[42] *Id.* (quoting *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009)).
[43] *Id.*

Case No. 1:21-cr-00815
GWIN, J.

back of a police cruiser. Kpakpo could not open the cruiser's doors from the inside.[44] And when Kpakpo asked whether he could leave the cruiser to make a private phone call, Trooper Miller told him he could not.[45]

Law enforcement informed Kpakpo of his *Miranda* rights twice before questioning him. Kpakpo then initialed and signed a written *Miranda* waiver and said he understood that his statements could be admitted at trial.[46] *Miranda* requires nothing more.

### ii. Kpakpo voluntarily made incriminating statements.

Kpakpo argues law enforcement coerced his incriminating statements. So, the Government must show by a preponderance of the evidence that Kpakpo made the statements voluntarily.[47] The Government satisfies this burden.

To determine voluntariness, the Court considers "the defendant's age, education and intelligence, his previous interactions with the criminal justice system, the length and extent of questioning, and the use of physical coercion such as deprivation of food or sleep."[48] These factors determine whether objectively coercive police activity overbore the defendant's will and became the crucial factor that motivated the defendant's statements.[49]

Kpakpo was not especially susceptible to interrogation. He is 37 and has multiple prior felony narcotics convictions. He graduated high school. He recalls being prescribed medical cannabis for mental-health problems, but states he is currently asymptomatic.[50]

---

[44] *See* Suppression Hr'g Tr.
[45] Gov't Ex. 9 at 21:25–22:40.
[46] Gov't Ex. 13; Gov't Ex. 15 at 4.
[47] *See* United States v. Mahan, 190 F.3d 416 (6th Cir. 1999).
[48] United States v. Clayton, 937 F.3d 630, 641 (6th Cir. 2019).
[49] *See id.*
[50] Doc. 3.

Case No. 1:21-cr-00815
GWIN, J.

Nor was the interview with Kampman and Wood objectively coercive. It lasted only about an hour.[51] Agents provided Kpakpo with food and water.[52] They did not use physical force against Kpakpo.[53]

Still, Kpakpo argues that the agents coerced involuntary incriminating statements by misleading him about the Accord's contents. But law enforcement's dishonesty does not make an otherwise voluntary confession involuntary.[54] Law enforcement may employ some "strategic deception" to elicit incriminating statements.[55]

Kpakpo also argues that law enforcement coerced his statements by conditioning his brother's release on Kpakpo's cooperation.

During the interview, the agents told Kpakpo several times that if he provided evidence exculpating his brother, his brother might not have to go to jail.[56] But true statements intended to appeal to Kpakpo's emotions do not make an otherwise voluntary confession involuntary.[57]

Moreover, the agents' suggestion that Kpakpo's cooperation could speed his brother's release did not overbear Kpakpo's will. Agent Wood told Kpakpo, "Your brother

---

[51] *Cf. Holland v. Rivard*, 800 F.3d 224, 241 (6th Cir. 2015) (questioning "for several hours on each of two days" was not coercive because it did not "require [defendant] to be confined to an interrogation room for 'eight, ten, twelve, twenty-four hours' at a time.").
[52] Suppression Hr'g Tr.
[53] *See* Gov't Ex. 14.
[54] *Frazier v. Cupp*, 394 U.S. 731, 739 (1969) ("The fact that the police misrepresented the [evidence against the suspect] is, while relevant, insufficient in our view to make this otherwise voluntary confession inadmissible").
[55] *See Illinois v. Perkins*, 496 U.S. 292, 297 (1990).
[56] Gov't Ex. 15 at 26–31.
[57] *See United States v. Sablotny*, 21 F.3d 747, 752 (7th Cir. 1994) ("[P]olice are allowed to play on a suspect's ignorance, fears and anxieties so long as they do not magnify these emotionally charged matters to the point where a rational decision becomes impossible.").

Case No. 1:21-cr-00815
GWIN, J.

could go home tonight if you give us access to your phones and we could see that he had nothing to do with this."[58] But Kpakpo did not consent to searching his phones.

### C. The arrest warrant was lawfully issued.

Finally, Kpakpo argues that his arrest warrant was tainted by his illegal seizure and unconstitutional interrogation.

Even without Kpakpo's interview statements,[59] law enforcement had probable cause to suspect Kpakpo's involvement in a drug-trafficking conspiracy. So, the warrant was lawfully issued.

### III. Conclusion

The Court **DENIES** Defendant Kpakpo's motion to suppress.

IT IS SO ORDERED.

Dated: October 14, 2022                    *s/    James S. Gwin*
                                            JAMES S. GWIN
                                            UNITED STATES DISTRICT JUDGE

---

[58] Gov't Ex. 15 at 31.

[59] In fact, it is unclear whether even a coerced statement would invalidate an otherwise valid arrest warrant. *See Mara v. Rilling*, 921 F.3d 48 (2d. Cir. 2019) (declining to "pursue the question of how the Fourth and Fifth Amendments might interact in such circumstances" because independent probable cause existed without the purportedly coerced statements); *Michaels v. New Jersey*, 222 F.3d 118, 123 (3d Cir. 2000) (constitutional guards against coerced confessions only apply when statements are used at trial, not in arrest warrant).

- 10 -